WILLIAM H. VOSBURGH, Respondent, *v.* THE LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY COMPANY, Appellant.

Where a railroad corporation purchased the line of another company, of which an existing bridge formed a part, which bridge at the time of the purchase was unsafe and dangerous by reason of defects in its original plan and construction, and such defects were obvious to the eye of a skilled inspector, and could have been easily and surely ascertained by proper examination, *held,* that it was negligence on the part of the corporation to continue its use without such an inspection and a correction of the defects; that it was liable to an employe upon one of its trains for injuries received by a fall of the bridge; and this, although the bridge had been in use for several years before the purchase.

*Devlin* v. *Smith* (89 N. Y. 470), distinguished.

*It seems* that the prior use might have justified a continuance of the use until a competent inspection could reasonably have been made, but did

not justify a neglect, to observe and remedy the defects when an inspection was made.

(Argued December 7, 1883 ; decided January 15, 1884.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, in favor of plaintiff, entered upon an order made April 8, 1882, which denied a motion for a new trial and directed judgment on a verdict.

This action was brought to recover damages for injuries sustained by plaintiff while in defendant's employ as a brakeman, in consequence of the falling of a bridge, as a train, upon which plaintiff was, was passing over it.

The material facts are stated in the opinion.

*James F. Gluck* for appellant. Assuming that the bridge fell by reason of certain defects inherent in its original construction, and not the result of use, and which defects, therefore, existed prior to the time at which it came into the defendant's possession, it was error on the part of the court to submit to the jury that question as one, the affirmative answer to which would result in establishing negligence on the part of the defendant. (*Devlin* v. *Smith*, 89 N. Y. 470, 476.) The request to charge " that if the defendant employed competent and trustworthy agents to examine and take charge of this structure, who assumed to do so during the time that it was the owner of or occupied the bridge, the defendant is not liable," should not have been denied. (Wood's Master and Servant, §§ 346, 348, 368; *Painton* v. *N. Cent. R'y Co.*, 83 N. Y. 7, 12.)

*Adelbert Moot* for respondent. The defendant was bound to furnish plaintiff with a reasonably safe bridge to pass over, and failing so to do, is liable. (*Swords* v. *Edgar*, 59 N. Y. 28 ; Shearman and Redfield on Negligence, §§ 93, 95 ; *Davis* v. *C. V. R. R. Co.*, 55 Vt. 84 ; 27 Alb. L. J. 106.) While it is true the defendant did not construct this bridge originally, having purchased it of a company that built it, and put it in use, it

376 Vosburgh v. Lake Shore & Mich. South. R. Co. [Jan.,

Opinion of the Court, per Finch, J.

should be held to the same rule as if it had constructed it; it was the occupant of the bridge, and hence primarily liable. (*Swords* v. *Edgar*, 59 N. Y. 28; *Ryan* v. *Wilson*, 25 Alb. L. J. 175.) It was a clear case of imperfect and inadequate means and appliances and imperfect machinery. (*Lansing* v. *N. Y. C. & H. R. R. R. Co.*, 49 N. Y. 521; 7 Lans. 70; Shearman and Redfield on Negligence, § 92.)

Finch, J. The plaintiff was a brakeman in the employ of the defendant company, and was injured by the fall of the bridge at Ashtabula on the 29th of December, 1876. He has recovered a judgment for damages, which is now sought to be reversed, upon the ground that there was no sufficient proof of negligence to carry the case to the jury. The bridge was built of iron, and spanned a gulf leading inland from the lake, and growing narrower as it approached the point of crossing. It was a deck bridge, constructed upon what is known as the Howe truss plan, frequently applied in the building of wooden bridges, but apparently in this one instance alone, made wholly of iron. It was originally constructed in 1864, by the Cleveland, Painesville and Ashtabula Railroad Company, a predecessor of the present defendant. The history of its construction is not encouraging. The superstructure was planned by Amasa Stone, who appears to have had a large experience in the designing and construction of railroad bridges, and at the time was president of the company for which the bridge was to be erected. Stone, however, merely " directed the method of making the plans," " and the method of carrying it out," " in general terms through agents and practical employes." He employed one Tomlinson " to make the design and draft of the structure, and the specifications and details." With reference to his capacity, Stone says only that he had been in his employ for about fifteen years, " more or less in the erection of *some* bridges," and that he regarded him as competent to execute the work under his, Stone's, " general directions." But Tomlinson evidently bungled his work, making the top chords too short, and planning to put in the braces with their webs hori

zontal instead of vertical; errors which so "annoyed" Stone that he "intimated to him that his resignation would be accepted, and put another man in charge." Who that was and what may have been his capacity we are not informed. These errors had to be corrected. In doing it, the top chords were elongated by inserting between their members thin plates of iron, called shim pieces, held in their places merely by the dead weight of the bridge and the loads upon it; the office of the top chords and braces under them being mainly to resist compression. When the position of the braces was altered, a few more were added, and this change compelled the chipping away of the lugs on the angle blocks in order to give the braces a fair bearing, and then some of them, crowded by the vertical rods, did not rest fully upon the angle blocks. The iron work for the bridge was done by Congdon, whose principal business appears to have been the construction and repair of locomotives, and who held the position of master mechanic.

The superstructure was put together and erected by one Rogers, who was a carpenter. The result which followed was not surprising. The bridge was put in its place and its members united by the aid of bents built up from the ground below, and when the blocks upon them were removed, the bridge sagged below a horizontal line. That occurred twice. The difficulty was sought to be remedied the first time by the lengthening of the top chords, which proved ineffectual, and the second time by the change in the braces. After that the top chords seem to have preserved their camber of two and one-half inches, and the bridge went into use, at first with a single track and later with a double track, and stood for about ten years, until its fall in 1876.

Upon all these questions of original plan and construction experts were examined. Their opinions differed, as is very common in such cases. But upon two things they agreed. Nobody disputed the mechanical axiom that the strength of a bridge is that of its weakest part, nor the rule of prudence that its factor of safety should have been five, when in truth it was only about three; that is, the bridge should have been

five times as strong as its breaking weight under expected loads, but was only of about three times that strength. As to other alleged defects — in the yoking of the main braces, so that each I beam acted independently instead of solidly as one; in the insufficiency of the lateral bracing; and the alleged movement or change of position of the braces upon the anchor-blocks — there was much difference of opinion and considerable contradiction in the evidence.

Enough has been said to indicate the questions of fact existing in the case, unless it be true that the defendant company was not responsible for any of the alleged defects because it acquired the bridge by purchase, as a completed and to some extent as a tested structure. In other words, the contention is, that a railroad company acquiring by purchase an additional line already built and in operation, of which an existing bridge forms a part, owes no obligation to its employes running trains over such bridge, except to keep it as good as when it was bought, and has a right without negligence to assume the sufficiency of its original plan and construction. The case relied upon for this doctrine is *Devlin* v. *Smith* (89 N. Y. 470; 42 Am. Rep. 311), but it has no application for two reasons. Smith, having no knowledge of scaffold-building, employed a builder known to him to be skillful and experienced, and owed to no one a duty of inspection, the proper performance of which would have disclosed the defect. The defendant here bought the bridge of another railroad company, and without any selection or choice of the builder. If Smith had found the scaffold already built and in the ownership of a person not an expert or scaffold-builder, and had bought it of such third person without knowing who designed it, or the plan and manner of its construction, and without inspection had sent his men upon it, a very different question would have been presented. And if the scaffold instead of a temporary had been a permanent structure, intended for continuous use through the years, and imposing upon Smith the duty of an inspection by skillful and competent agents, whose proper performance of that duty would have disclosed defects of construction which made it dangerous and unsafe,

again a different question would have been presented. Assuming as we must what the jury could have found from the evidence, that the bridge when purchased was unsafe and dangerous by reason of defects in its original plan and construction, and which defects were obvious to the eye of a skilled inspector, and easily and surely ascertainable by a structural analysis determining its factor of safety, it was negligence on the part of the defendant to continue its use in the face of such obvious defects without ascertaining their effect upon its strength and capacity. The purchasing company either knew or did not know the facts relating to its original construction. It is probable that they knew them. Their chief engineer, Collins, whose duty it was to inspect this bridge, and who did so, was the engineer of the constructing company. He built the abutments of this very bridge, and in all probability knew that the general plan was dictated by a man busy about every thing else; that its draftsman and actual designer made mistakes and was discharged because of them; that the man who put it up was a carpenter without experience in iron bridges; and that the structure was altered and modified twice before it would bear its own weight. If the defendant company through its chief engineer knew this, it knew enough to be guilty of negligence, if it relied upon such a plan and construction without further investigation, and in sole reliance upon the fact that it had not yet fallen. But if the company did not know it, if it bought the bridge in ignorance of who built it, and the character and safety of its plan, and used and inspected it without even knowing or ascertaining its factor of safety, or the prudence of its design, although warned by the presence of obvious defects, they simply shut their eyes and took the risk on the sole faith of its previous use. Collins is said to have been a competent man. Year after year he examined this bridge, but always on the assumption that his sole duty was to see that every thing was in place and that no signs of weakness were developed by the test of passing trains, and never once to ascertain the safety of its plan and design. The defects pointed out by the evidence were almost all obvious to the eye of a com-

petent examiner. A structural analysis, easily made by such an examiner, would have shown that instead of a factor of safety of six times its breaking weight, as Stone says he intended, it had but half that strength and was far below the ordinary standard of safety.

The learned counsel for the appellant insists that the defendant did employ suitable and competent persons to inspect the bridge, who did make the usual and customary examinations, and that there is no dispute about that in the evidence. But it is plain that the inspection described in the proofs as customary is that made by a company which has built its own bridges. In such case it already knows the plan and mode of construction, and is already responsible for the lack of reasonable care in either the design or its execution. The subsequent inspection is directed only to its perfect repair, and to indications of weakness. But where the company does not know either the safety of the plan or the prudence of the construction because it has purchased it completed, and in use, and knows nothing of the skill or want of skill of the builder, an inspection which takes no heed of that inquiry when defects are obvious, and lack of safety is indicated and may be easily ascertained, is not sufficient. The employer must exercise reasonable care in furnishing the servant with the means and implements of his service. That the master does not do when he buys an unsafe and defective bridge, whose obvious deficiencies give warning of possible danger, and sends his servants upon it without inquiry as to the skill of its construction or safety of its design. The servant is entitled to that care whether the master builds the bridge or buys it. The risk and the injury are the same in either case. Of course the test of actual, previous use goes for something. It might justify a continuance of that use until a competent inspection could reasonably be made, but would not justify a neglect when it was made to observe and remedy obvious defects and elements of danger, because existing in the original plan, and an omission to learn by a well-understood process whether in view of its apparent defects it had the ordinary surplus of strength. Upon railroad bridges, every

day and almost every hour, the lives of passengers and of employes are trusted.   It is not requiring too much to insist that, whether built or purchased, the company shall take reasonable care to know or ascertain the safety of their design and construction, and shall be charged with knowledge of defects which a competent examination would have disclosed.

It is apparent, therefore, that in this case there were questions of fact for a jury.   Whether the bridge was in truth defective in particulars, not latent or undiscoverable, but open and obvious to the eye of a skilled and faithful inspector ; and whether that inspector did make such an examination as reasonable care required and the company should have exacted in the exercise of such care under the existing circumstances, and in view of such obvious and apparent defects, were questions of fact in the case, and properly submitted to the jury.

The judgment should be affirmed, with costs.

All concur, except ANDREWS, J., who took no part.

Judgment affirmed.